96 October 25, 2017 No. 57

## IN THE SUPREME COURT OF THE
## STATE OF OREGON

Julie PARRISH,
Sal Esquivel,
and Cedric Hayden,
*Petitioners,*

*v.*

Ellen F. ROSENBLUM,
Attorney General,
State of Oregon,
*Respondent.*

(SC S065300)

En Banc

On petition to review ballot title filed September 27, 2017;* considered and under advisement on October 13, 2017.

Eric C. Winters, Wilsonville, filed the petition and reply for petitioners.

Carson L. Whitehead, Assistant Attorney General, Salem, filed the answering memorandum for respondent. With him on the answering memorandum were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Steven C. Berman, Stoll Stoll Berne Lokting & Shlachter PC, Portland, filed the memorandum for *amicus curiae* Melissa Unger.

BALMER, C. J.

The ballot title is referred to the Attorney General for modification. Pursuant to ORAP 1.20(5) and notwithstanding ORAP 9.25, ORAP 11.30(10), ORAP 16.25(1), and ORAP 16.60(1), the State Court Administrator shall issue the appellate judgment at 4:00 p.m. on October 26, 2017,

_____

* Ballot title for Referendum Petition 301 (2018), prepared by the Joint Legislative Committee for RP 301 on September 20, 2017.

unless a petition for reconsideration is both filed and physically received by the Office of the State Court Administrator by that time. Any timely petition for reconsideration will stay issuance of the appellate judgment until the court acts on such petition.

**BALMER, C. J.**

Petitioners seek review of the ballot title prepared for Referendum Petition (RP) 301 (2018). They contend that the caption, the "yes" and "no" result statements, and the summary do not comply with requirements set out in ORS 250.035(2). We review the ballot title to determine whether it substantially complies with those requirements. *See* Senate Bill (SB) 229 (2017), § 58(4) (setting out that standard).[1] For the reasons explained below, we agree with some of petitioners' contentions, but disagree with others. We conclude that each part of the ballot title requires modification, and we refer it to the Attorney General for that purpose. *See id.* at § 58(6) (explaining modification referral process).

## I.  BACKGROUND

We begin by providing some background and a summary of RP 301. During the 2017 session, the legislature passed House Bill (HB) 2391.[2] Among other things, that bill created a new Health System Fund, which would pay the cost of administering a new Oregon Reinsurance Program, provide additional funding for medical assistance and health services to low-income individuals and families under ORS chapter 414, and make other payments. HB 2391, § 2; ORS ch 414.[3] The bill then imposed temporary, two-year assessments on insurance premiums or premium equivalents received by insurers (section 5(2)), managed care organizations (section 9(2)), and the Public Employees' Benefit Board (section 3(2)), that would be paid into the State Treasury and credited to the fund. *See id.* at §§ 3 - 5, 7, 11 - 13 (imposing assessments, directing payments

---

[1] SB 229 will appear in the 2017 session laws as Oregon Laws 2017, chapter 749. Oregon Laws 2017, Regular Session, Tables, Senate and House Bills Enacted, A-1.

[2] HB 2391 will appear in the 2017 session laws as Oregon Laws 2017, chapter 538. Oregon Laws 2017, Regular Session, Tables, Senate and House Bills Enacted, A-3.

[3] The stated purpose of the new Oregon Reinsurance Program is to stabilize rates and premiums for individual health benefit plans, and to provide greater certainty to consumers. HB 2391 §§ 17-25. The funding under ORS chapter 414 is for the Oregon Health Plan.

and credits, and establishing timelines).[4] The bill further provided, in section 8(2), that insurers may increase their premium rates by 1.5 percent on policies subject to the temporary assessment on insurers. Also, in section 27(2)(2), the bill imposed a temporary assessment on the net revenue of certain hospitals, to be paid to the Oregon Health Authority. *Id.* at §§ 27 - 28 (imposing assessment, directing payment, and setting out related amendments); § 29 (removing assessment at later date); §§ 44, 51 (setting out operative and effective dates).[5] The Governor signed the bill on July 3, 2017, and it was scheduled to go into effect, with some delayed operative dates, on October 6, 2017.

Two days after the Governor signed HB 2391, petitioners filed with the Secretary of State a referendum petition, which the Secretary numbered as RP 301 and which is set out as an Appendix to this opinion. RP 301 would refer to the people for a vote certain sections of HB 2391—sections 3(2) and (4); 5(2) and (4); 9(2) and (5); and 27(2)(2)—that impose the temporary assessments described above, as well as section 8(2), which permits insurers to increase their premium rates.[6] *See generally* Or Const, Art IV, § 1(3)(a) - (b) (describing people's referendum power and process). The timelines for a potential referendum vote, and the related ballot title process, are governed by a different bill enacted during the 2017 session, SB 229. That bill provides that, if any part or all of HB 2391 is referred to the people, then a special election will be held on January 23, 2018. SB 229, § 55(1)(a)(A). Under applicable constitutional provisions, petitioners were required to gather and submit a sufficient number of signatures before October 6. *See* Or Const,

---

[4] HB 2391 defines a "premium equivalent" as a claim for reimbursement of the cost of a health care item or service provided to an eligible employee or family member, plus administrative costs and excluding certain items. HB 2391, § 3(1)(b).

[5] Those funds reimburse hospitals for the cost of providing care to Oregon Health Plan recipients, pay for services provided in the Oregon Health Plan, and pay administrative costs. Or Laws 2003, ch 736, § 9.

[6] Due to this referendum effort, the sections of HB 2391 contained in RP 301 have not yet gone into effect. HB 2391 contained numerous other provisions not at issue here—some described above—that took effect on October 6, 2017. HB 2391, § 51. Several of those provisions have delayed operative dates. HB 2391, §§ 43-46. *See also* Or Const, Art IV, § 1(4)(d) (referendum on part of an act does not delay remainder of act from becoming effective).

Art IV, § 1(3)(a) (referendum power may be exercised as to acts not effective earlier than 90 days after end of session); § 1(4)(a) (setting out 30-day signature verification timeline for Secretary of State). The Secretary of State has confirmed that petitioners submitted a sufficient number of valid signatures and that RP 301 therefore will be on the ballot at a special election in January, as Measure 101 (2018).[7]

After RP 301 was filed, a joint legislative committee prepared a ballot title and filed it with the Secretary of State. *See* SB 229, § 55(3) (establishing process). The ordinary word limits for ballot titles do not apply; however, the content requirements for each element of a ballot title for a state measure—set out in ORS 250.035(2) and discussed further below—do apply. *Id.* at §§ 55(3), 58(1). We review the ballot title for substantial compliance with those requirements. *Id.* at § 58(4). If we determine that modification is required, then we may refer the ballot title to the Attorney General for modification. *Id.* at § 58(6).

The joint legislative committee prepared the following ballot title for RP 301:

> "PROVIDES FUNDS CURRENTLY BUDGETED TO PAY FOR HEALTH CARE FOR LOW-INCOME INDIVIDUALS AND FAMILIES AND FOR STABILIZING HEALTH INSURANCE PREMIUMS, USING TEMPORARY ASSESSMENTS ON INSURANCE COMPANIES, SOME HOSPITALS AND OTHER PROVIDERS OF HEALTH INSURANCE OR HEALTH CARE COVERAGE.

> "RESULT OF 'YES' VOTE: 'Yes' vote provides funds that are currently budgeted to pay for health care for low-income individuals and families and individuals with disabilities and to stabilize premiums charged by insurance companies for health insurance purchased by individuals and families. Approves temporary assessments on insurance companies, some hospitals, the Public Employees' Benefit Board and managed care organizations to provide the funds. Specifies that insurance companies may not increase rates on health insurance premiums by more

---

[7] *See* Oregon Secretary of State, January 2018 Special Election Announcement (Oct 16, 2017), http://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid =2358 (accessed Oct 23, 2017).

than 1.5 percent as a result of the assessment. Provides that the hospital assessment may not begin without the approval of a federal agency.

"RESULT OF 'NO' VOTE: 'No' vote underfunds budgeted costs for providing health care to low-income individuals and families and individuals with disabilities and for stabilizing premiums charged by insurance companies for health insurance purchased by individuals and families. Rejects temporary assessments on insurance companies, the Public Employees' Benefit Board and managed care organizations. Delays until the later of January 1, 2018, or the date of approval by a federal agency, the temporary assessment on some hospitals.

"SUMMARY: This measure asks voters to approve or reject five parts of House Bill 2391, enacted by the 2017 Oregon Legislature to address certain health care funding issues. House Bill 2391 provided funding to pay costs for providing health care to low-income adults, children, families and individuals with disabilities, and to stabilize premiums charged by insurance companies for health insurance purchased by individuals and families. House Bill 2391 provided the funding through a 1.5 percent assessment on premiums and premium equivalents (defined) of health insurance companies, the Public Employees' Benefit Board and managed care organizations for a two-year period, and an additional 0.7 percent assessment on the net revenue of some hospitals that begins on October 6, 2017, and ends on July 1, 2019. This measure asks voters to approve or reject the assessments on insurance companies, the Public Employees' Benefit Board and managed care organizations and only the portion of the hospital assessment that is in effect from October 6, 2017, through the later of January 1, 2018, or the date a federal agency approves other changes to the assessment made by House Bill 2391. The measure does not ask voters to approve or reject the portions of the hospital assessment that are in effect beginning on the later of January 1, 2018, or the date of federal agency approval."

Petitioners object to all parts of the ballot title. In response, the Attorney General and *amicus* Unger contend that the ballot title substantially complies with statutory requirements. We address their contentions below.

## II.   ANALYSIS

A.   *Caption*

We begin with the caption, which must "reasonably identif[y] the subject matter" of RP 301. ORS 250.035(2)(a). Petitioners contend that the caption fails to satisfy that standard in several ways. First, the caption does not reasonably identify the temporary assessments imposed in sections 3(2), 5(2), 9(2), and 27(2)(2) of HB 2391 (now contained in RP 301), nor the authority for insurers to increase premiums in section 8(2). Second, the caption is a long, run-on sentence that obscures those "direct subjects" of RP 301 by inappropriately magnifying and focusing on "secondary and speculative" effects—that is, programs that "*may* be funded" under HB 2391 (emphasis petitioners'). Third, to more accurately describe the temporary assessments, the caption should use the word "tax." Petitioners contend that the caption is "fundamentally flawed and should be discarded." The Attorney General and *amicus* Unger respond that the caption appropriately explains that the revenue from the temporary assessments will fund certain programs budgeted in HB 2391, and they also disagree with petitioners' remaining contentions.

The "subject matter" of a proposed measure, ORS 250.035(2)(a), refers to its "actual major effect" or, "if the measure has more than one major effect, all such effects" within any applicable word limit. *Whitsett v. Kroger*, 348 Or 243, 247, 230 P3d 545 (2010). "To determine the subject matter of a proposed measure, we first examine its words and the changes, if any, that the proposed measure would enact in the context of existing law." *Kain/Waller v. Myers*, 337 Or 36, 41, 93 P3d 62 (2004). As explained, the ballot title for RP 301 has no applicable word limit, but its caption nonetheless must state or describe the subject matter accurately, "in terms that will not confuse or mislead potential petition signers and voters." *Greene v. Kulongoski*, 322 Or 169, 175, 903 P2d 366 (1995). For the reasons explained below, we agree with petitioners that the ballot title caption for RP 301 does not substantially comply with ORS 250.035(2)(a), in two ways.

We begin with the text of RP 301. That measure is not a referendum on HB 2391 in its entirety, but instead includes only certain sections of the bill. The major, immediate effect based on the text alone—that is, the new law that RP 301 would enact—is the imposition of new, temporary assessments (sections 3(2), 5(2), 9(2), and 27(2)(2)), and the related grant of authority to insurers to increase insurance premiums (section 8(2)). The temporary assessments are generally described in the second part of the caption.

When considered in the context of existing law, another major effect is apparent: Once approved, the new temporary assessments would work together with the other provisions of HB 2391, such that the incoming revenue would be directed to the Health System Fund or the Oregon Health Authority to pay for—as described in the caption—"health care for low-income individuals and families," and "stabilizing health insurance premiums." Indeed, it appears that, without most of the temporary assessments, the Health System Fund would lose the revenue sources created in HB 2391.[8] We disagree with petitioners that those effects on the intended operation of HB 2391 are merely "speculative." To the contrary, those substantial effects are intertwined with the new assessments and are appropriately included in the caption. *See generally Kain/Waller*, 337 Or at 41-44 (measure that would impose broad property tax cap had effect of significantly altering existing tax structure; caption must describe that effect); *cf. Caruthers v. Myers*, 343 Or 162, 166 P3d 514 (2007) (approving caption that described only proposed new tax exemption but not predicted effect on existing tax revenues and funded programs; measure concerned limited tax exemption for only certain property owners, without any structural tax implications).

Underlying petitioners' arguments, however, is the proposition that the caption obscures the immediate, major effect that flows directly from the text of RP 301: imposition of new temporary assessments. As written, the caption

---

[8] A different part of HB 2391, not at issue here, provides some conditional initial funding for the Health System Fund. HB 2391, § 42. The record suggests, however, that all anticipated incoming revenue for the fund would derive from the temporary assessments on insurers, managed care organizations, and the Public Employees' Benefit Board.

first emphasizes with some detail the programs designed to benefit from "currently budgeted" revenue generated by the assessments and then states, in a secondary manner, that those programs would be funded by "using" the assessments. That framing has the potential of misleading voters, by suggesting that the assessments already exist. *See McCormick v. Kroger/Devlin*, 347 Or 293, 299, 220 P3d 412 (2009) (caption that stated that a proposed tax increase would "maintain[]" budgeted funds for particular governmental services did not accurately convey that referendum would provide additional new revenue); *Fred Meyer, Inc. v. Roberts*, 308 Or 169, 174, 777 P2d 406 (1989) (caption did not reasonably identify measure's subject, because it may have led voters to think that they were simply being asked to confirm existing law).

Also, as petitioners suggest, the caption as written may confuse or mislead voters, by including a lengthy—and difficult to read—description of programs funded in HB 2391 before describing the new temporary assessments that would fund them. We agree that the immediate, direct effect of RP 301 must be more prominently, and also accurately, explained. The caption therefore must be modified, so that it clearly conveys to voters that RP 301 would impose new temporary assessments that would fund certain programs. *See generally Kendoll v. Rosenblum*, 358 Or 282, 289, 364 P3d 678 (2015) (referring caption that was "unnecessarily difficult to understand" and, therefore, did not "sufficiently explain the subject matter").

Petitioners also contend that the subject matter of RP 301 includes not only the temporary assessments, but also the authority granted to insurers in section 8(2) to increase their premium rates on policies subject to the assessments on insurers. The caption, however, does not mention that aspect of the subject matter at all; instead, it refers to only the assessments. As noted above, we agree with petitioners that the authority to increase premiums set out in section 8(2) is also a major effect of RP 301. Particularly given that no word limit applies to the caption, it must be modified to reasonably identify that additional subject matter set out in section 8(2). *See Kendoll*, 358 Or at 288-89 (2015) (caption

should highlight, for potential voters, "significant component of the subject matter" reflected in express text enacting change to current law); *Towers v. Myers*, 341 Or 357, 361, 142 P3d 1040 (2006) (caption that described only one of several changes that proposed measure would make to existing law was impermissibly underinclusive).

Petitioners also argue that the caption's general description of the temporary assessments—"temporary assessments on insurance companies, some hospitals and other providers of health insurance or health care coverage"—does not reasonably identify the types and amounts of the assessments, and who must pay them. Petitioners are correct that sections 3(2), 5(2), 9(2), and 27(2)(2) of HB 2391, as set out in RP 301, more specifically identify certain entities as subject to new temporary assessments designated at particular rates.[9] A ballot title caption, however, need not convey that level of specificity, so long as the subject matter is accurately conveyed in an understandable way. We conclude that the more general description of the temporary assessments in the caption substantially complies with the "subject matter" requirement of ORS 250.035(2)(a). *See Blosser/Romain v. Rosenblum (IP 45)*, 358 Or 295, 300-01, 365 P3d 525 (2015) (approving general wording in caption and rejecting argument for more specific wording, more appropriately used in other parts of ballot title); *McCann/ Harmon v. Rosenblum*, 354 Or 701, 707, 320 P3d 548 (2014) ("[a]t times, it may be necessary to describe [measure's] effects generally").

Finally, petitioners argue that the caption's use of the term "temporary assessments" does not sufficiently convey the subject matter of RP 301 because, in essence, the assessments are actually "taxes." As petitioners put it, an

---

[9] Those sections impose the following assessments:

- Public Employees' Benefit Board, 1.5 percent of gross amount of premium equivalents received during calendar quarter (section 3(2));

- Insurers, 1.5 percent of gross amount of premiums earned during calendar quarter, derived from health benefit plans delivered or issued for delivery in Oregon (section 5(2));

- Managed care organizations, 1.5 percent of gross amount of premium equivalents received during calendar quarter (section 9(2)); and

- Certain hospitals, 0.7 percent on net revenue (section 27(2)(2)).

"assessment" based on a percentage of net revenue (or on insurance premium earnings or equivalents) "is a tax in every normative sense of the word," and the revenue-raising mechanism set out in the identified provisions possesses "the essential features" of levying a tax. Petitioners add that, before funds generated by the assessments can be "use[d]" to provide funding for various purposes described in the caption, they first must be collected, and the "means of collecting them in RP 301 are taxes." They also argue that use of the word "assessments" alone has little value and, without the additional or substitute term "tax," will mislead voters.

The Attorney General and *amicus* Unger disagree with those arguments, as do we. RP 301 itself characterizes the payments required under sections 3(2), 5(2), (9)(2), and 27(2)(2) as "assessment[s]," not "taxes." *See* RP 301 (incorporating HB 2391, sections 3(4), 5(4), and 9(5), all providing that "[t]he *assessment* imposed under this section is in addition to and not in lieu of any tax, surcharge or other assessment imposed on [the same type of entity]" (emphasis added); and incorporating section 27(2)(2), which imposes additional "assessment" on certain hospitals). And, in the context of the ballot title, it is apparent that the purpose of the temporary assessments is to provide funding for certain programs. It follows that use of the term "assessments," drawn from RP 301 itself, would not confuse or mislead voters, and does not fall short of the substantial compliance standard. *See Dale v. Kulongoski*, 322 Or 240, 242-43, 905 P2d 844 (1995) (approving caption that incorporated commonly understood term that was drawn from measure's text, "bills for raising revenue"; rejecting argument that "bills enacting taxes" should be used, instead); *Bernard v. Keisling*, 317 Or 591, 596-97, 858 P2d 1309 (1993) (approving caption's use of term "fee," drawn from measure's text, instead of "tax"); *cf. McCann v. Rosenblum*, 355 Or 256, 261-62, 323 P3d 955 (2014) (approving caption's use of "tax" in lieu of measure's wording, "fee," when meaning of "fee" would raise substantial questions). Stated differently, this is not a situation in which the use of technical, legal, or unique wording drawn from the measure's text results in a caption that is impermissibly misleading or confusing. *Cf. Caruthers v. Myers*, 344 Or 596, 600, 189 P3d 1 (2008) (using words of

proposed measure itself in caption to describe subject matter does not always result in "accurate and neutral" description); *Tauman v. Myers*, 343 Or 299, 302-04, 170 P3d 556 (2007) (term drawn directly from proposed measure can impermissibly confuse voters, when measure defines term differently from commonly understood meaning). In that respect, the caption substantially complies with ORS 250.035(2)(a).

B.   *"Yes" Result Statement*

Petitioners next challenge the "yes" result statement, generally arguing that it has "similar flaws" as the caption. *See* ORS 250.035(2)(b) ("yes" result statement must set out "[a] simple and understandable statement * * * that describes the result" if a proposed measure is approved); *McCann/Harmon*, 354 Or at 707 ("yes" result statement "should describe the most significant and immediate effects of the ballot initiative for the general public" (internal quotation marks omitted)). As discussed above, we agree that the "yes" result statement does not substantially comply with ORS 250.035(2)(b) because it must more prominently, and also accurately, explain the immediate, direct result of voting "yes" on RP 301—imposition of the new temporary assessments and insurer authority to increase premiums. We therefore refer the "yes" result statement to the Attorney General for modification.

C.   *"No" Result Statement*

Next, petitioners challenge the "no" result statement, first raising the same argument as with the "yes" result statement. *See* ORS 250.035(2)(c) ("no" result statement must be "[a] simple and understandable statement * * * that describes the result" if a proposed measure is rejected). We agree, as explained regarding the caption and the "yes" result statement, that the "no" result statement does not substantially comply with ORS 250.035(2)(c) and must be modified accordingly.

Petitioners also argue that the final sentence of the "no" result statement impermissibly includes "speculative operational dates" for the temporary assessment on hospitals, set out in section 27(2)(2) of HB 2391 and RP 301. That sentence provides:

"Delays until the later of January 1, 2018, or the date of approval by a federal agency, the temporary assessment on some hospitals."

That sentence conveys that, if the voters reject RP 301, with the effect of removing section 27(2)(2) from HB 2391, then the temporary assessment on hospitals still would be imposed, but would be delayed until the later of two alternative dates.

Petitioners' argument arises from a dispute about the legal significance of the fact that all or part of a different section of HB 2391—section 28—was not incorporated into RP 301, along with section 27(2)(2). We first explain that issue, to provide context for petitioners' argument that the final sentence of the "no" result statement is impermissibly speculative and therefore does not substantially comply with ORS 250.035(2)(c).

Section 27(2)(2) of HB 2391, contained in RP 301, would impose a temporary assessment on each hospital in the state, with certain hospitals excluded. Under HB 2391 as originally written and absent this referendum effort, that section would have become effective on October 6, 2017. HB 2391, § 51. Section 28 of HB 2391 repeats the full text of section 27, but then amends some of its provisions, including section 27(2)(2). That amendment, however, does not change the text that imposed the temporary assessment on hospitals; instead, it changes the text describing the categories of hospitals that are excluded from those assessments. HB 2391, § 28(2)(2).[10] As to operability, the amendments to section 27, set out in section 28, are conditioned on whether the

---

[10] Section 27(2)(2) of HB 2391 provides, in part:

"*** [A]n assessment of 0.7 percent is imposed on the net revenue of each hospital in this state that is not a waivered hospital."

Section 28(2)(2) amends that provision as follows (deleted text in [*brackets/italics*]; new text in **{braces/boldface}**):

"*** [A]n assessment of 0.7 percent is imposed on the net revenue of each hospital in this state that is not a [*waivered hospital*]**{type A hospital or type B hospital}**."

"Type A" and "type B" hospitals are small, rural hospitals; "type A" hospitals are more than 30 miles from another acute inpatient care facility, whereas "type B" hospitals are 30 miles or less from such a facility. *See* HB 2391, §§ 26(5)-(6) (referring to existing statutory definitions); ORS 442.470(5)(a)(A), (B) (setting out definitions).

Centers for Medicare and Medicaid Services (CMS) of the federal Department of Health and Human Services takes a certain action that pertains to the updated categories identified in section 28(2)(2). If CMS takes that action, then all of section 28 becomes operative on the later of either January 1, 2018, or the date that CMS acts. HB 2391, § 44(1)(a).[11] Finally, another section of HB 2391 that is not contained in RP 301—section 29(2)—amends both sections 27(2)(2) and 28(2)(2), to remove the temporary assessment on hospitals entirely. Section 29 becomes operative on July 1, 2019. HB 2391, § 44(1)(c).

Thus, as HB 2391 was originally enacted by the legislature, the temporary assessment on hospitals set out in section 27(2)(2), with the original exclusion provision, would have gone into effect on October 6, 2017. That temporary assessment was intended to continue until July 1, 2019, when section 29 becomes operative and eliminates the assessment. However, the categories of hospitals excluded from the temporary assessment might change at an earlier date, if CMS takes the identified predicate action that triggers the operability of section 28(2)(2). That earlier date would be the later of January 1, 2018, or the date that CMS takes action.

---

A "waivered hospital" is one that is either type A or type B, or one that provides only psychiatric care, or others that have obtained waivers from a longstanding hospital assessment that is different from the temporary assessment at issue in RP 301. Or Laws 2003, ch 736, § 1(5), *as amended by* Or Laws 2009, ch 792, § 34(5).

[11]  HB 2391, § 44(1) provides, in part:

"If the [CMS] permits the state to impose the assessment under section 2, chapter 736, Oregon Laws 2003, on type A hospitals and type B hospitals and to exclude from the assessment public hospitals other than health district hospitals:

"(a) *** [T]he amendments to sections 1, 2 and 9, chapter 736, Oregon Laws 2003, by sections 26, 28 and 34 of this 2017 Act become operative on the later of:

"(A) January 1, 2018; or

"(B) The date of the approval by the [CMS]."

The temporary assessment on hospitals imposed in section 27(2)(2) of HB 2391 is a supplement to a previously enacted assessment originally set out in Oregon Laws 2003, chapter 736, section 2. *See* HB 2391, § 27 (setting out subsequent history of Oregon Laws 2003, chapter 736, section 2). The pending, conditional CMS action—described in the just-quoted section of HB 2391—relates to that previously enacted assessment.

The last sentence of the "no" result statement is based on the following theory, if the voters reject RP 301 and thus remove section 27(2)(2) from HB 2391: (1) No part of section 28 is included in RP 301; (2) section 28(2)(2) therefore would go into effect, even if RP 301 is rejected, so long as CMS takes action; (3) that section sets out and incorporates, as previously enacted law, the temporary assessment on hospitals imposed in section 27(2)(2); therefore, (4) even without section 27(2)(2), that assessment still would be permitted under section 28(2)(2); but (5) it would begin according to the conditional and alternative timelines provided for section 28(2)(2) (the later of January 1, 2018, or the date that CMS takes action), instead of the timeline for section 27(2)(2) (originally, October 6, 2017; now dependent on RP 301). Petitioners argue that that theory is speculative and may be incorrect; more expressly, if section 27(2)(2) is removed from HB 2391 by virtue of a "no" vote on RP 301, section 28(2)(2) might not operate to "resuscitate[]" the temporary assessment on hospitals. The Attorney General counters that the theory reflected in the "no" result statement is not speculative, and she states that, once section 28 becomes operative, the temporary hospital assessment "authorized" and "imposed" in that section will "supersede" the assessment authorized in section 27. *Amicus* Unger similarly contends that the "no" statement describes "an actual result" that will occur if RP 301 is rejected.

This court has explained that, when reviewing a ballot title, it is not the court's task to "definitively interpret the proposed measure" and, "[w]hen the legal effect of a measure is unclear, we will not speculate about it." *Conroy v. Rosenblum*, 358 Or 807, 815, 371 P3d 1180 (2016), *modified ballot title referred*, 359 Or 601, 380 P3d 299 (2016); *see also Wolf v. Myers*, 343 Or 494, 500, 173 P3d 812 (2007) (when parties reasonably dispute meaning of provision in proposed measure, that dispute may lead to disagreement about result). Applying those principles here, we agree with petitioners that the "no" result statement should not convey, as a definitive statement, that the temporary assessment on hospitals still will be imposed, but delayed based on federal agency action. Whether or not that temporary assessment

would continue to be imposed if section 27(2)(2) is rejected by the voters is a legal question that relates to the amendatory wording of section 28(2)(2) of HB 2391 in light of RP 301—a question more appropriately left to a later day, if RP 301 is rejected. *See generally State ex rel Caleb v. Beesley*, 326 Or 83, 88, 949 P2d 724 (1997) (absent clear indication to the contrary, a statute incorporated within an amendatory act is deemed neither repealed nor reenacted merely by being so incorporated); *State v. McGinnis*, 56 Or 163, 165, 108 P 132 (1910) (restated wording in an amendatory act is considered part of the original statute, whereas only the new additions are regarded as a new enactment); *see also Rooney v. Kulongoski (Elections Division #13)*, 322 Or 15, 41, 902 P2d 1143 (1995) (not court's role to engage in abstract exercise of preenactment interpretation; proponents and opponents remain free to emphasize purported effects or point to possible ambiguities). The "no" result statement therefore must be modified so that it does not convey that, if RP 301 is rejected, the temporary assessment on hospitals still would be imposed, but delayed.

D.  *Summary*

Petitioners raise two challenges to the summary, which must contain a "concise and impartial statement * * * summarizing the * * * measure and its major effect." ORS 250.035(2)(d). First, they argue that, as with the "no" result statement, the last two sentences of the summary impermissibly set out the same speculative theory about the temporary assessment on hospitals.[12] As described above, we agree that those parts of the summary do not substantially comply with ORS 250.035(2)(d), and the summary must be modified accordingly.

_____

[12]  Those two sentences provide:

"This measure asks voters to approve or reject the assessments on insurance companies, the Public Employee's Benefit Board and managed care organizations *and only the portion of the hospital assessment that is in effect from October 6, 2017, through the later of January 1, 2018 or the date a federal agency approves other changes to the assessment made by House Bill 2391. The measure does not ask voters to approve or reject the portions of the hospital assessment that are in effect beginning on the later of January 1, 2018, or the date of federal agency approval.*"

(Emphasis added.)

Petitioners also argue, as they did with the caption, that the summary should include the term "tax," either in place of or supplementing the term "assessments." We rejected that argument in our discussion of the caption and do so here, as well.[13]

## III.   CONCLUSION

In sum, we conclude that all parts of the ballot title for RP 301 must be modified, and, pursuant to SB 229, § 58(6), we refer it to the Attorney General for modification.

The ballot title is referred to the Attorney General for modification. Pursuant to ORAP 1.20(5) and notwithstanding ORAP 9.25, ORAP 11.30(10), ORAP 16.25(1), and ORAP 16.60(1), the State Court Administrator shall issue the appellate judgment at 4:00 p.m. on October 26, 2017, unless a petition for reconsideration is both filed and physically received by the Office of the State Court Administrator by that time. Any timely petition for reconsideration will stay issuance of the appellate judgment until the court acts on such petition.

---

[13] Petitioners also note that, in conjunction with their proposal to provide more detail to the caption, which had included adding the terms "premium equivalents" and "managed care organizations," the summary should define those terms. Because we rejected petitioners' argument that the caption required that degree of specificity, we do not address their related request pertaining to the summary.

APPENDIX—REFERENDUM PETITION 301 (2018)

79th OREGON LEGISLATIVE ASSEMBLY—
2017 Regular Session

Enrolled

House Bill 2391

Introduced and printed pursuant to House Rule 12.00.
Presession filed (at the request of House Interim
Committee on Health Care)

AN ACT

Relating to access to health care; creating new provisions; amending ORS 291.055, 731.292, 731.509 and 731.840 and sections 1, 2, 3, 5, 7, 9, 10, 12, 13 and 14, chapter 736, Oregon Laws 2003, and section 2, chapter 26, Oregon Laws 2016; repealing section 15, chapter 389, Oregon Laws 2015; prescribing an effective date; and providing for revenue raising that require approval by a three-fifths majority.

House Bill 2391 was passed by the Oregon Legislative Assembly containing 51 sections. This text was filed as a referendum on the corresponding portions of HB 2391 pursuant to Article IV, Section 1(3) of the Oregon Constitution.

Be It Enacted by the People of the State of Oregon:

SECTION 3.

(2)   No later than 45 days following the end of a calendar quarter, the Public Employees' Benefit Board shall pay an assessment at the rate of 1.5 percent on the gross amount of premium equivalents received during the calendar quarter.

(4)   The assessment imposed under this section is in addition to and not in lieu of any tax, surcharge, or other assessment imposed on the board.

SECTION 5.

(2)   No later than 45 days following the end of a calendar quarter, an insurer shall pay an assessment at the rate of 1.5 percent of the gross amount of premiums earned by the insurer during that calendar quarter that were derived

from health benefit plans delivered or issued for delivery in Oregon.

(4)   The assessment imposed under this section is in addition to and not in lieu of any tax, surcharge, or other assessment imposed on an insurer.

### SECTION 8.

(2)   Notwithstanding any provision of contract or statute, including ORS 743B.013 and 743.022, insurers may increase their premium rate on policies or certificate that are subject to the assessment under section 5 of this 2017 Act by 1.5 percent. If an insurer increases its rates under this subsection, the insurer may include in its billings for health benefit plans a notice, as prescribed by the Department to Consumer and Business Services, explaining that the increase is due to the assessment under section 5, of this 2017 Act.

### SECTION 9.

(2)   No later than 45 days following the end of a calendar quarter, a managed care organization shall pay an assessment at a rate of 1.5 percent of the gross amount of premium equivalents received during that calendar quarter.

(5)   The assessment imposed under this section is in addition to and not in lieu of any tax, surcharge, or other assessment imposed on a managed care organization.

SECTION 27. Section 2, chapter 736, Oregon Laws 2003, as amended by section 1, chapter 780, Oregon Laws 2007, section 51, chapter 828, Oregon Laws 2009, section 17, chapter 867, Oregon Laws 2009, section 2, chapter 608, Oregon Laws 2013, and section 1, chapter 16, Oregon Laws 2015, is amended to read:

Sec. 2.(2)   In addition to the assessment imposed by subsection (1) of this section, an assessment of 0.7 percent is imposed on the net revenue of each hospital in this state that is not a waivered hospital.